1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

9
10
11

JOHNNY LUGO IBARRA, IV,

Petitioner,

v.

ANTHONY HEDGPETH,

Respondent.

Case No.  1:10-cv-01809-LJO-SAB-HC

FINDINGS AND RECOMMENDATION
REGARDING PETITION FOR WRIT OF
HABEAS CORPUS

16
17

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

Petitioner is currently in the custody of the California Department of Corrections and

Rehabilitation pursuant to a judgment of the Superior Court of California, County of Fresno,

following his conviction by jury trial on May 18, 2006, of one count of second degree murder

(Cal. Penal Code § 187(a)), three counts of assault with a deadly weapon (Cal. Penal Code §

245(c)), one count of possession for sale of methamphetamine (Cal. Health & Saf. Code §

11378), and one count of transportation of methamphetamine (Cal. Health & Saf. Code §

27
28

1

11379(a)).  (CT[1] 405-415.)  Several enhancements were also found true.  On August 17, 2006, Petitioner was sentenced to serve a term of thirty years to life for the assault convictions, and a consecutive term of thirty years to life for the murder conviction.  (RT[2] 2908-2912.)

Petitioner timely filed a notice of appeal.  On December 27, 2007, the California Court of Appeal, Fifth Appellate District, affirmed the judgment.  (LD[3] 4.)  The California Supreme Court denied review on April 9, 2008.  (LD 6.)  Petitioner then filed a petition for writ of certiorari in the United States Supreme Court.  The petition was denied on March 2, 2009.  (LD 7.)

On February 18, 2010, Petitioner filed a petition for writ of habeas corpus in the California Supreme Court.  On June 2, 2010, he submitted a supplemental brief in support of the petition.  On September 15, 2010, the California Supreme Court denied the petition with citation to In re Swain, 34 Cal.2d 300, 304 (1949).  (LD 10.)

Petitioner filed a federal petition for writ of habeas corpus in this Court on September 26, 2010.  Respondent filed a motion to dismiss the petition on January 24, 2011, based on a failure to exhaust state remedies.  On March 3, 2011, Magistrate Judge Dennis L. Beck found that the petition contained unexhausted claims and recommended dismissal.

Petitioner then filed a motion for stay and abeyance on April 11, 2011.  The Court determined that Petitioner had not demonstrated good cause for a stay under Rhines v. Weber, 544 U.S. 269 (2005).  However, Petitioner was informed that he could delete the unexhausted claims and return to the state courts to exhaust his unexhausted claims while the petition was held in abeyance pursuant to Kelly v. Small, 315 F.3d 1063 (9th Cir. 2003).  Under Kelly, Petitioner could later amend his petition to include the exhausted claims once the state habeas process was completed.  Nevertheless, Petitioner was cautioned that the stay did not operate to toll the statute of limitations, and the deleted claims might prove to be untimely upon his return to federal court.  Petitioner chose to delete the unexhausted claims and proceed with a Kelly stay.  On June 16, 2011, the Court vacated the Findings and Recommendation, dismissed the nine unexhausted claims, and held the remaining claims in abeyance.

---

[1] "CT" refers to the Clerk's Transcript on Appeal.
[2] "RT" refers to the Reporter's Transcript on Appeal.
[3] "LD" refers to the documents lodged by Respondent.

On May 18, 2012, Petitioner filed a habeas petition in the California Supreme Court. (ECF No. 40 at 3.)  The petition was denied on October 10, 2012, with citation to In re Robbins, 18 Cal.4th 770, 780 (1998), In re Clark, 5 Cal.4th 750, 767-769 (1993), People v. Duvall, 9 Cal.4th 464, 474 (1995); and In re Swain, 34 Cal.2d 300, 304 (1949).  (ECF No. 46 at 22.)

On November 14, 2012, Petitioner filed a First Amended Petition in this Court.  The petition presents the following grounds for relief: (1) Petitioner argues defense counsel rendered ineffective assistance by failing to conduct an adequate pretrial investigation; (2) He claims the prosecutor committed misconduct by failing to disclose police reports to the defense; (3) He contends the trial court violated his due process rights by refusing to order a mental competency hearing; (4) He argues the trial court deprived him of his Sixth Amendment right to counsel by denying his request to dismiss his appointed attorney and retain private counsel; (5) He claims the evidence was insufficient to support the murder conviction under the provocative act doctrine; and (6) He contends his appellate counsel rendered ineffective assistance by failing to raise the previous five claims.

On January 16, 2013, Respondent was directed to file a response.  On February 22, 2013, Petitioner filed a motion for leave to file a Second Amended Petition.  On June 25, 2013, Petitioner's motion to file a Second Amended Petition was denied.  On August 26, 2013, Respondent filed a response to the First Amended Petition.  Petitioner filed a third motion to amend the petition on September 16, 2013.  The Court denied the third motion to amend on November 8, 2013.  Petitioner filed a traverse on April 7, 2014.

## II.

## STATEMENT OF FACTS[4]

### Prosecution Evidence

On the afternoon of September 20, 2005, a confidential informant introduced Fresno Police Detective Cervantes to appellant, who arrived for the meeting alone, in a blue PT Cruiser. Cervantes and appellant negotiated a deal whereby

---

[4] The Fifth District Court of Appeal's summary of the facts in its December 27, 2007, opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court adopts the factual recitations set forth by the state appellate court. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009) ("We rely on the state appellate court's decision for our summary of the facts of the crime.").

Cervantes would purchase three pounds of crystal methamphetamine from appellant for $7,800 per pound. Appellant and Cervantes agreed to meet up later, although the location was not decided at this point.

The police department's narcotics team decided to conduct the transaction in the McDonald's parking lot at Jensen and 99. The fact it is a public area affords the undercover officers some protection, while the physical layout is such that suspects can be placed away from civilians and, should officers have to use their weapons, their line of fire will be toward an embankment and away from nearby businesses. Additionally, officers were hoping to catch appellant when he had just picked up the narcotics, which he had said were coming from Indio through Selma, so that he would have the maximum amount of drugs on hand.

Once the team was in position, between 6:00 and 6:30 p.m., Cervantes advised appellant of where he wanted to conduct their transaction. During the course of several telephone calls between appellant and the confidential informant, who would pass his phone to Cervantes, the presence of a female voice alerted Cervantes to the fact there was a female involved somehow. This was perhaps 40 minutes before appellant and the female arrived in the McDonald's parking lot. Later, the confidential informant received a telephone call and advised Cervantes that appellant and the girl were en route. Cervantes informed the case agent, Detective Garza, by cell phone that appellant was coming with a female, and he also said it over the wire he was wearing so that whoever was monitoring the wire (on this occasion, Detective Robles) would also hear that information.

Cervantes's vehicle was parked in the west portion of the parking lot, in the second stall from the Days Inn Motel that shared the lot with McDonald's, facing westbound. It did not move from that location during ensuing events. The confidential informant's vehicle was parked in the stall immediately south. When appellant arrived, he parked just north of Cervantes's vehicle, on its passenger side. By this time, it was getting close to 7:30 or 8:00 p.m., and it was dark out and raining heavily. There was ambient light from street lights in the parking lot, including one single-headed lamp just north of appellant's vehicle, another south of Cervantes's vehicle, and a four-headed lamp, with the lamps pointing in all directions, behind the vehicles and toward the middle of the lot. According to Sergeant Williams, there was sufficient light to see.

As per his preference when conducting a narcotics transaction, Cervantes was unarmed. He got into the driver's side back seat of appellant's car and left the door slightly ajar. He greeted appellant and the female, later identified as 17-year-old Katrina Campos. After some small talk, he asked whether appellant had brought the methamphetamine. Appellant manipulated the steering column so he could reach underneath that area, then handed Cervantes a Tupperware-type container encased in plastic wrap and with a dryer sheet of fabric softener to eliminate the smell of the crystal methamphetamine. After unwrapping and opening the container, Cervantes found what appeared to be a pound of crystal methamphetamine. When he asked appellant whether he had brought all three pounds, appellant replied that he had. Cervantes closed the container, set it down in the center console area, said he would be getting the money, exited the vehicle, and gave the prearranged arrest signal. At no time did he see any weapons, nor did appellant or Campos do anything threatening.

As Cervantes returned to the driver's side of his vehicle, the assisting officers-Sergeant Flores, Detective Lowry, Officer Jauregui, Detective Garza, Sergeant Williams, Detective Robles, and Detective Cardinale-converged on the location in

their vehicles. Flores positioned his vehicle at an angle toward the PT Cruiser's rear driver's side, approximately two feet behind that vehicle; Cardinale parked to the right and behind the PT Cruiser so that the center of his truck's bumper was three to four feet behind the right rear corner of that vehicle; Williams parked his car in the hole between Flores's and Cardinale's trucks, perhaps 20 to 25 feet from the rear of the PT Cruiser; and Lowry and Jauregui, who were together in Lowry's vehicle, positioned themselves behind Flores's pickup. As the intent was to block in appellant's car, only small spaces remained between the vehicles, and Lowry estimated a couple of feet separated the PT Cruiser from the nearest undercover vehicle.

As the detectives exited their vehicles to make the arrest, a number of them began loudly shouting that they were police and that appellant was to show them his hands. In addition, the officers were wearing their tactical vests, which had a four- to five-inch white or yellow Fresno Police Department star, along with (except in the case of Officer Jauregui) a patch bearing the word "Police" on the front, and the word "Police" in large letters on the back. Memories varied as to whether the headlights on some or all of the undercover vehicles were on. There were also differing assessments of the extent of visibility, as it was dark and raining and the PT Cruiser's rear windows were tinted. Nevertheless, the officers' consensus was that there was sufficient lighting to illuminate the scene and, to a certain extent, the interior of the PT Cruiser. For instance, Cardinale testified that, when he exited his vehicle, he could see appellant. He did not see anybody else inside the car even when he was firing, despite the fact the windshield was not tinted.  Luis Chavez was in his room at the Days Inn when he heard approximately three seconds of yelling and then, after one or two seconds, what sounded like five to eight firecrackers. He was unable to tell from the yelling that the people involved were police, although he later saw they were wearing dark shirts with yellow lettering on the back.

The officers approached appellant's vehicle from different directions. Lowry, who moved to the rear driver's side of the PT Cruiser, was carrying an H & K MP5 machine gun with a flashlight mounted on it. Garza, who approached from the rear passenger side, had a .40-caliber Beretta pointed in appellant's direction. Williams exited his vehicle carrying a less-than-lethal beanbag shotgun. Flores was positioned so that he was leaning over the front hood of Cervantes's vehicle, with his handgun pointed at appellant.

As Lowry approached, he saw appellant looking to the right and left and his hand moving toward what appeared to be the gear shift. The two made eye contact when Lowry was at the rear of the vehicle. Appellant appeared to be trying to see who was coming up on either side. As Cardinale approached, he saw appellant turn and look over his right shoulder. The two men made eye contact, and appellant said something. Garza also saw appellant look in his direction. Appellant made eye contact with Robles, then yelled, "Fuck, it's the cops." Cervantes, who was still sitting in the vehicle parked next to the PT Cruiser, had a fairly clear view of appellant. He saw appellant look over both shoulders a couple of times, then appellant turned back forward and mouthed, "Fuck, police."

Almost simultaneously, appellant started the vehicle and put it in reverse. His engine was revving loudly and his wheels started to spin, as the car was unable to gain traction right away. The car then traveled in reverse at a high rate of speed. At the time the PT Cruiser began moving, Cardinale was on the passenger side of the vehicle, making his way to the front of the car. Williams was about 10 feet from the back of the vehicle. Garza was approximately five feet behind it and

toward the passenger side. Jauregui was approximately 12 feet directly behind the car.

The car immediately sideswiped the front of Flores's truck, ricocheted off, and began moving directly at Williams and Garza. Williams attempted to get back to and over his vehicle, but did not think he would make it because appellant was coming so fast. As he jumped for his vehicle, however, he heard a burst of gunfire. Given the car's rate of speed, Garza did not believe getting out of the way was an option; there was no doubt in his mind that he was going to get hit. His mind told him to shoot two rounds at the driver and jump on the back of the bumper of the car. Garza recalled jumping on the bumper; with him there, the PT Cruiser hit the driver's side of Williams's car with enough force to crumple the rear wheel of that car, then moved forward a little. Garza's feet then slipped to the ground and he was able to jump over the hood of Williams's vehicle and get out of the way. His legs were hurting so that he could barely walk. In addition, there was a gash on his left arm for which he received eight stitches. Although Garza did not know how he received that injury, he later found broken, tinted glass in his pockets. Garza did not recall firing any shots, but a subsequent check of his weapon revealed he had fired two rounds.

Seeing the PT Cruiser moving backward extremely fast and believing Garza's life was in danger because appellant was going to run over him or crush him between the PT Cruiser and Williams's car, Cardinale also opened fire. He was carrying a .40-caliber Beretta pistol and was positioned in front of the PT Cruiser, which was fishtailing. He fired five times at an angle into the windshield, at appellant.

When the car accelerated back toward him and started to make a swerving or turning motion with its front end, Jauregui fired his weapon, because the car kept coming at him. Although he could not say how close he was at the time, it seemed like the vehicle was right on top of him, and it was accelerating "pretty fast." He could not see appellant or Campos. He fired once into the back window at the driver, then dove out of the way. He heard other shots that seemed to be fired simultaneously. Although he believed he heard gunfire before he shot, it was possible he fired first. The PT Cruiser was still moving at the time. He was unaware that Garza also fired into the back window.

All told, the PT Cruiser moved perhaps one and a half car lengths from its original location in the parking stall to where it finally came to rest. Appellant, who was slumped over toward the center console area, had been shot behind the left ear, with the bullet exiting out his nose, and in the shoulder. Campos, whose presence had previously been unknown to several of the officers, was seated in an upright position, holding a cell phone. She died from a bullet wound to the head. Five bullet strike marks were found on the outside of the PT Cruiser's windshield, while one came from the back of the vehicle and struck the inside of the windshield.

Appellant subsequently was determined to be unarmed. A search of the PT Cruiser revealed three Tupperware-like containers, each of which contained approximately a pound of methamphetamine. In Cervantes's training and experience, a user will have no more than half a gram to a gram of crystal methamphetamine in his or her possession at a given time.

***Defense Evidence***

Appellant, who suffered a federal conviction in 1998 for armed bank robbery,

testified that the confidential informant had been trying to do business with him over a period of three months as of September 20, 2005. By that time, appellant was fairly confident he was dealing with drug dealers from Mexico.

Katrina Campos, appellant's fiancée, accompanied him that night, although he tried to convince her not to. When appellant parked in the allotted stall, Cervantes opened the car door and got in without appellant having seen him approach. After appellant showed Cervantes the container of methamphetamine he had in a compartment under the dashboard, Cervantes got out of the car, saying he was going to get the money, but did not shut the door all the way. Appellant moved his seat back so he could shut the door, as rain was coming in, and then he reached down to the floorboard to get another pound of methamphetamine. As he was doing that, Campos was turning down the radio. She then loudly said, "Oh my God." She looked at appellant and then over her left shoulder, and appellant became concerned because he heard yelling. He could not make out any words. Appellant thought the yelling, which sounded muffled, was coming from his left side, the side of his good ear. According to appellant's mother, a bout with scarlet fever when appellant was seven years old left him with hearing loss in his right ear. He looked in his rearview mirror and saw a dark shadow block his car and someone coming who appeared to have a large rifle. Appellant then saw a truck.

Appellant looked in his mirror very quickly, then something to the right drew his attention. He heard tire sounds and saw another car block him off. There was a small gap between the cars, and he could see two figures. He looked over both shoulders, trying to assess what was going on. At the same time, knowing he might have to get out of there, he put the car in reverse. He thought he could hear someone on the passenger side of his car, but the door post blocked his view. All he could think of was the person on his left with the large gun. Appellant imagined the man shooting him in the head.

Appellant had the car in reverse, but with his foot on the brake. Then he heard a "bap" or "poof" on the back window, like someone hit it with a bat. The sound caused him to turn around and look briefly at the window, but it also caused him to hit the gas while he still had his foot on the brake. Appellant had had this car for about a month. Although it had an automatic transmission, he was used to driving with a manual transmission. Although he had only seen the person on his left side, he believed there were several people around the car. At no time did he suspect the individuals were police. Appellant was shot after the car started moving; he had turned the steering wheel to aim for the gap on the passenger side, and initially believe the car had rolled over. Later, at the hospital, he asked Detective Cardenas who had shot him, and Cardenas responded that it had been the Fresno Police Department.

During this incident, appellant felt his life was in danger. If he had heard the officers identify themselves and issue commands, he would have complied with their directives. If there had been only one officer, however, he was not sure whether he would have obeyed.

The gap to the car's right was appellant's planned safe route, even though he knew he might hit the other vehicle. No matter what, even if he had to run over someone, he was going to head for the gap, if the people were trying to kill him. That is what he assumed was going to happen; despite being in a public place with cars around and people screaming at him, he believed he was being robbed at gunpoint. After he determined he was boxed in and heard the "poof," he made the decision to get the car out of there.

1   (LD 4.)

2               **III.**

3             **DISCUSSION**

4     **A.**    **Jurisdiction**

5       Relief by way of a petition for writ of habeas corpus extends to a person in custody

6 pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

7 or treaties of the United States.   28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v.

8 Taylor, 529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

9 guaranteed by the U.S. Constitution.  The challenged conviction arises out of Fresno County

10 Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28

11 U.S.C. § 2241(d).

12       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

13 of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

14 enactment.  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

15 Cir. 1997) (en banc).  The instant petition was filed after the enactment of the AEDPA and is

16 therefore governed by its provisions.

17     **B.**    **Standard of Review**

18       Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

19 barred unless a petitioner can show that the state court's adjudication of his claim:

20
21 > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

22
23 > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

24 28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

25 (2011); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams, 529 U.S. at 413.

26       As a threshold matter, this Court must "first decide what constitutes 'clearly established

27 Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71

28 (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

1    Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as
2    of the time of the relevant state-court decision." Williams, 592 U.S. at 412.  "In other words,
3    'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles
4    set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,
5    the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal
6    principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in
7    . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of
8    review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v.
9    Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.
10   Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an
11   end and the Court must defer to the state court's decision.  Carey, 549 U.S. 70; Wright, 552 U.S.
12   at 126; Moses, 555 F.3d at 760.

13          If the Court determines there is governing clearly established Federal law, the Court must
14   then consider whether the state court's decision was "contrary to, or involved an unreasonable
15   application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28
16   U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ
17   if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a
18   question of law or if the state court decides a case differently than [the] Court has on a set of
19   materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at
20   72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite
21   in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's
22   Third New International Dictionary 495 (1976)).  "A state-court decision will certainly be
23   contrary to [Supreme Court] clearly established precedent if the state court applies a rule that
24   contradicts the governing law set forth in [Supreme Court] cases." Id.  If the state court decision
25   is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed
26   under the pre-AEDPA de novo standard.  Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en
27   banc).

28          "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

9

1  the state court identifies the correct governing legal principle from [the] Court's decisions but

2  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at

3  413.  "[A] federal court may not issue the writ simply because the court concludes in its

4  independent judgment that the relevant state court decision applied clearly established federal

5  law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411;

6  see also Lockyer, 538 U.S. at 75-76.  The writ may issue only "where there is no possibility

7  fairminded jurists could disagree that the state court's decision conflicts with [the Supreme

8  Court's] precedents." Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists

9  could disagree on the correctness of the state courts decision, the decision cannot be considered

10  unreasonable.  Id.  If the Court determines that the state court decision is objectively

11  unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the

12  error had a substantial and injurious effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619,

13  637 (1993).

14      Petitioner has the burden of establishing that the decision of the state court is contrary to

15  or involved an unreasonable application of United States Supreme Court precedent.  Baylor v.

16  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

17  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

18  state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669

19  (9th Cir. 2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

20      The AEDPA requires considerable deference to the state courts.  "[R]eview under §

21  2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

22  the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review."

23  Cullen v. Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations

24  by state courts are presumed correct absent clear and convincing evidence to the contrary."

25  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(e)(1)).  However, a

26  state court factual finding is not entitled to deference if the relevant state court record is

27  unavailable for the federal court to review.  Townsend v. Sain, 372 U.S. 293, 319 (1963),

28  *overruled by*, Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).

**C.      Review of Claims**

1.      <u>Ineffective Assistance of Counsel</u>

In his first claim for relief, Petitioner alleges his defense attorney rendered ineffective assistance by failing to conduct an adequate pretrial investigation.  He contends counsel failed to: (1) obtain copies of the autopsy reports; (2) interview the pathologist who conducted the autopsy; (3) obtain a copy of the C.S.I. report of Dr. Matt King; (4) obtain copies of follow-up reports of I.B. Technician Matthew Pombo; (5) interview several officers, doctors and nurses who were witnesses when Petitioner was admitted to the hospital; (6) investigate photographs and diagrams; and (7) interview Manuel Burciaga concerning past police officer conduct.

**a.      Untimeliness**

Respondent argues that Petitioner's ineffective assistance of counsel claim is untimely in that Petitioner did not present the claim to the federal court within the one year statute of limitations.  Respondent's argument is persuasive.

The AEDPA imposes a one-year period of limitation on petitioners seeking to file a federal petition for writ of habeas corpus.  28 U.S.C. § 2244(d)(1).  As amended, § 2244, subdivision (d) reads:

> (1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of –
>
>> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>>
>> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>>
>> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>>
>> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

In most cases, the limitations period begins running on the date that the petitioner's direct review became final.  In this case, direct review became final on March 2, 2009, when the United State Supreme Court denied certiorari.  Petitioner had one year until March 2, 2010, in which to file his federal petition for writ of habeas corpus.

Title 28, United States Code, Section 2244(d)(2) states that the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward" the one year limitation period.  28 U.S.C. § 2244(d)(2).  In Carey v. Saffold, 536 U.S. 214, 215 (2002), the Supreme Court held the statute of limitations is tolled where a petitioner is properly pursuing post-conviction relief, and the period is tolled during the intervals between one state court's disposition of a habeas petition and the filing of a habeas petition at the next level of the state court system.  See also Nino v. Galaza, 183 F.3d 1003, 1006 (9th Cir. 1999).  Nevertheless, state petitions will only toll the one-year statute of limitations under § 2244(d)(2) if the state court explicitly states that the post-conviction petition was timely or was filed within a reasonable time under state law.  Pace v. DiGuglielmo, 544 U.S. 408 (2005); Evans v. Chavis, 546 U.S. 189 (2006).

In this case, Petitioner filed his first state habeas petition in the California Supreme Court on February 14, 2010, prior to the expiration of the statute of limitations.  The petition was denied on September 15, 2010.  Pursuant to § 2244(d)(2), the petition served to toll the statute of limitations for a period of 214 days.  Therefore, the expiration of the statute of limitations occurred on October 4, 2010.[5]  Petitioner filed his second state habeas petition in the California Supreme Court on June 4, 2012, but it had no tolling consequences since the limitations period had already expired, see Jiminez v. Rice, 276 F.3d 478, 482 (9th Cir. 2001), and Petitioner was not proceeding to the next highest appellate level, see Carey, 536 U.S. at 215.

Petitioner filed his federal habeas petition on September 26, 2010, before the limitations

---

[5] As noted by Respondent, the date 214 days after March 2, 2010, was October 2, 2010.  Since October 2, 2010, fell on a Saturday, the federal petition was due on Monday, October 4, 2010.

1    period expired.  However, the unexhausted claims were dismissed from that petition, and the first

2    amended petition was not filed until November 14, 2012, which was after the expiration of the

3    limitations period.  When a petition is dismissed for failure to exhaust, any newly exhausted

4    claims in a subsequent petition only relate back to the original petition if the new claims are tied

5    to claims that were exhausted at the time of filing by "a common core of operative facts." Fed. R.

6    Civ. P. 15(c); King v. Ryan, 564 F.3d 1133, 1140-42 (9th Cir. 2009) (applying the relation back

7    principles discussed in Mayle v. Felix, 545 U.S. 644, 657 (2005), the Ninth Circuit found that

8    any newly exhausted claims must be compared with the properly exhausted claims).  New

9    grounds do not relate back if they differ in both "time and type" from those in the original

10   petition.  Mayle, 545 U.S. at 657.

11           Here, Petitioner's claim is one of ineffective assistance of counsel.  As Respondent notes,

12   Petitioner did not raise any ineffective assistance of counsel claims in his initial federal petition.

13   Rather, Petitioner claimed that his attorney conspired with judges, prosecutors, and police

14   officers to block all defense investigation and discovery of evidence, including the autopsy

15   reports, doctors' reports, and investigative reports.  Therefore, the claims are of a different "type"

16   from those in the initial petition and do not relate back.  Id.; see also Dean v. United States, 278

17   F.3d 1218, 1222-23 (11th Cir. 2002).  In addition, the claims depend on facts that differ in both

18   time and type.  The claim in the initial petition involved active participation in a conspiracy with

19   allegations that defense counsel sought to assist police and the prosecution in framing Petitioner

20   for the murder.  The claim depends on facts quite different from those facts surrounding the

21   allegations that counsel rendered ineffective assistance by failing to investigate witnesses and

22   reports.  Therefore, Petitioner's ineffective assistance of counsel claim does not relate back to the

23   original petition and therefore must be dismissed as untimely.

24           **b.      Procedural Default**

25           Respondent also alleges that Petitioner has procedurally defaulted the claim. Respondent

26   contends that the state's denial of the claim as untimely, among other things, procedurally bars

27   the Court from considering the merits of the claim.

28           The Supreme Court has held that a federal court will not review claims in a petition for

1 writ of habeas corpus if the state court has denied relief on those claims on a state law ground
2 that is independent of federal law and adequate to support the judgment. Coleman v. Thompson,
3 501 U.S. 722, 750 (1991). "The state-law ground may be a substantive rule dispositive of the
4 case, or a procedural barrier to the adjudication of the claim on the merits." Walker v. Martin, __
5 U.S. __, 131 S.Ct. 1120, 1127, 179 L.Ed.2d 62 (2011). This doctrine of procedural default is
6 based on concerns of comity and federalism. Coleman, 501 U.S. at 730-32.

7      There are limitations as to when a federal court should invoke procedural default and
8 refuse to evaluate the merits of a claim because the petitioner violated a state's procedural rules.
9 Procedural default can only block a claim in federal court if the state court "clearly and expressly
10 states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263
11 (1989).

12      If the court finds an independent and adequate state procedural ground, "federal habeas
13 review is barred unless the prisoner can demonstrate cause for the procedural default and actual
14 prejudice, or demonstrate that the failure to consider the claims will result in a fundamental
15 miscarriage of justice." Noltie v. Peterson, 9 F.3d 802, 804-805 (9th Cir. 1993); Coleman, 501
16 U.S. at 750.

17      Here, the California Supreme Court denied Petitioner's second state habeas petition
18 citing, inter alia, In re Robbins, 18 Cal.4th 770, 780 (1998). (See ECF No. 46 at 22.) The
19 citation to Robbins signifies the petition was denied as untimely. In citing to Robbins, the
20 California Supreme Court found the petition to be procedurally deficient; therefore, the Court did
21 not reach the merits of the petition but determined habeas relief was procedurally foreclosed. A
22 California court's finding of untimeliness is considered independent and adequate for purposes
23 of procedural default. Walker v. Martin, __ U.S. __, 131 S.Ct. 1120, 1128-31 (2011); Bennett v.
24 Mueller, 322 F.3d 573, 582-83 (9th Cir. 2003). Therefore, Petitioner may only avoid the bar if he
25 can show cause and actual prejudice, or demonstrate that failure to consider the claim will result
26 in a fundamental miscarriage of justice. In this case, Petitioner fails to do so. Accordingly,
27 Respondent correctly argues that the claim is procedurally barred. Nevertheless, the Court will
28 also address the claims since they are plainly without merit.

1   **c.      Merits**

2   i.      <u>Failure to Obtain Copies of Autopsy Reports</u>

3   Petitioner contends that defense counsel rendered ineffective assistance by failing to

4   obtain copies of the autopsy reports of the victim, Katrina Campos.

5   The law governing ineffective assistance of counsel claims is clearly established.

6   <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus

7   alleging ineffective assistance of counsel, the court must consider two factors.  <u>Harrington</u>, 131

8   S.Ct. at 787; <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344,

9   346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient,

10  requiring a showing that counsel made errors so serious that he or she was not functioning as the

11  "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687.  The petitioner must

12  show that "counsel's representation fell below an objective standard of reasonableness," and

13  must identify counsel's alleged acts or omissions that were not the result of reasonable

14  professional judgment considering the circumstances. <u>Harrington</u>, 131 S.Ct. at 787 (citing

15  <u>Strickland</u>, 466 U.S. at 688); <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348 (9th Cir.

16  1995).  Petitioner must show that counsel's errors were so egregious as to deprive defendant of a

17  fair trial, one whose result is reliable.  <u>Strickland</u>, 466 U.S. at 688.  Judicial scrutiny of counsel's

18  performance is highly deferential.   A court indulges a "'strong presumption' that counsel's

19  representation was within the 'wide range' of reasonable professional assistance." <u>Harrington</u>,

20  131 S.Ct. at 787 (quoting <u>Strickland</u>, 466 U.S. at 687); <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456

21  (9th Cir. 1994).

22  Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a

23  reasonable probability that, but for counsel's unprofessional errors, the result ... would have been

24  different," <u>Strickland</u>, 466 U.S. at 694.  "It is not enough 'to show that the errors had some

25  conceivable effect on the outcome of the proceeding.'" <u>Harrington</u>, 131 S.Ct. at 787 (quoting

26  <u>Strickland</u>, 466 U.S. at 693).  "Counsel's errors must be 'so serious as to deprive the defendant

27  of a fair trial, a trial whose result is reliable.'" <u>Harrington</u>, 131 S.Ct. at 787-788 (quoting

28  <u>Strickland</u>, 466 U.S. at 687).  A court need not determine whether counsel's performance was

1   deficient before examining the prejudice suffered by the petitioner as a result of the alleged

2   deficiencies.   Strickland, 466 U.S. at 697.   Since the defendant must affirmatively prove

3   prejudice, any deficiency that does not result in prejudice must necessarily fail.

4          Establishing that a state court's application of Strickland was unreasonable under 28

5   U.S.C. § 2254(d) is very difficult. Harrington, 131 S.Ct. at 788.  Since the standards created by

6   Strickland and § 2254(d) are both 'highly deferential,' when the two are applied in tandem,

7   review is 'doubly' so. Harrington, 131 S.Ct. at 788 (quoting Knowles v. Mirzayance, 556 U.S.

8   111, 123 (2009)).

9          In this case, Petitioner fails to demonstrate that counsel erred or that the alleged error

10  prejudiced him. As he acknowledges in his traverse, he fails to state what the autopsy report

11  would have revealed or how the outcome would have been any different.  He merely speculates

12  that the report could have been useful.   Thus, Petitioner fails to prove that the state court

13  rejection of his claim was unreasonable.  The claim is without merit.

14         ii.     Failure to Interview Pathologist

15         Petitioner next argues that defense counsel rendered ineffective assistance by failing to

16  interview the pathologist concerning the autopsy reports.  To succeed on a claim of ineffective

17  assistance of counsel based upon a failure to investigate or call a witness, Petitioner must identify

18  the witness in question, and state with specificity what that witness would have testified to, as

19  well as how the witness' testimony might have altered the outcome of the trial. Alcala v.

20  Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).   Petitioner must show that the witness in

21  question was actually available and willing to testify. Id. at 872-73. Generally, this requires

22  submission of affidavits from the witness himself.  Dows v. Wood, 211 F.3d 480, 486 (9th Cir.

23  2000); see also Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir.), as amended by 253 F.3d 1150

24  (9th Cir. 2001) (mere speculation of possible helpful information from potential witnesses is not

25  sufficient to show ineffective assistance of counsel).   Here, Petitioner does not identify the

26  pathologist, provide any declarations or affidavits from the pathologist, or state what evidence

27  the pathologist would have provided had he been interviewed.  To be sure, Petitioner does not

28  demonstrate that the outcome of the trial would have been different had the pathologist been

1   interviewed.  Therefore, the claim fails.

2        iii.     <u>Failure to Investigate C.S.I. Reports</u>

3        Petitioner claims counsel also failed to investigate the C.S.I. reports of Dr. Matt King.

4   Petitioner contends the reports would have impeached the investigating officers.  As Respondent

5   correctly argues, the claim is meritless since the amended petition clearly shows that Dr.

6   Matthew King did in fact prepare an "Accident Reconstruction and Fire Investigation" report for

7   Petitioner's defense attorney.  (<u>See</u> ECF No. 55 at 65-68.)  Thus, Petitioner's contention that

8   defense counsel failed to investigate the report is not credible.  In his traverse, Petitioner claims

9   counsel failed to present the report to the jury, but he fails to state what information the reports

10   contained that would have impeached the officers.

11        iv.     <u>Failure to Investigate Follow-up Reports of I.B. Technician Pombo</u>

12        Next, Petitioner faults defense counsel for failing to investigate the follow-up reports of

13   I.B. Technician Matthew Pombo.  Like the previous claims, this claim fails because Petitioner

14   does not state what the report would have revealed.  He fails to demonstrate that counsel erred or

15   that the outcome would have been any different.

16        v.     <u>Failure to Interview Doctors, Nurses, and Police Officers</u>

17        Petitioner also contends that defense counsel failed to interview the doctors, nurses and

18   police officers who were present when he was admitted to the hospital.  As with the previous

19   claims, this claim fails because Petitioner does not state what information the officers, doctors

20   and nurses would have provided, or how this evidence would have altered the outcome.

21        vi.     <u>Failure to Investigate Photographs and Diagrams</u>

22        Petitioner complains that defense counsel failed to investigate all of the photographs and

23   diagrams taken on the night of the incident.  In his traverse, he points to certain photographs that

24   reveal a wet spot on a tire.  He notes that it had rained heavily the night before yet the ground

25   was dry in the photo.  He claims the wet spot could only be present if the vehicle had been

26   moved from the time of the incident to the time the photos were taken.  He notes that there was

27   testimony at trial that the cars had not been moved prior to the photos being taken.  He concludes

28   that defense counsel should have called the testimony into question based on this evidence.

1   Petitioner's line of reasoning is pure conjecture.   Moreover, even if counsel could
2   establish that the vehicles were moved prior to the photos being taken, he fails to demonstrate
3   how this could possibly have mattered to the outcome of the trial.   The manner in which
4   Petitioner maneuvered his vehicle in his attempt to evade apprehension was based on testimony
5   from numerous eyewitnesses and undisputed.   Thus, Petitioner cannot establish prejudice.

6          vii.   Failure to Interview Manuel Burciaga

7         Finally, Petitioner alleges that defense counsel failed to interview Manuel Burciaga.
8   Respondent contends that the claim is unexhausted, and in any case, without merit.

9         A petitioner who is in state custody and wishes to collaterally challenge his conviction by
10  a petition for writ of habeas corpus must exhaust state judicial remedies.   28 U.S.C. § 2254(b)(1).
11  A petitioner can satisfy the exhaustion requirement by providing the highest state court with a
12  full and fair opportunity to consider each claim before presenting it to the federal court.   Duncan
13  v. Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971); Johnson v.
14  Zenon, 88 F.3d 828, 829 (9th Cir. 1996).   In this case, Respondent is correct that Petitioner did
15  not present this claim to the California Supreme Court.   Therefore, it is unexhausted and should
16  be dismissed.   Nevertheless, 28 U.S.C. § 2254(b)(2) permits review of the claim if it is, as here,
17  plainly without merit.

18        Petitioner directs the Court's attention to the declaration of Manuel Burciaga, attached as
19  Exhibit A to the amended petition. (See ECF No. 46 at 14-15.)   The declaration is dated July 22,
20  2012.   In said declaration, Burciaga states he is currently a prisoner at the Federal Correctional
21  Institution located in Lompoc, California.   He states he "[does not] know much about
22  [Petitioner's] case other than it's simular [sic] to mine." (Id. at 14.)   He further states that he was
23  shot twice in the back, and that he originally believed he was shot by Detective Eddy, because
24  that was what his reports had indicated.   However, he contends he was actually shot by Officer
25  Garza.

26        The claim is completely meritless.   First, the declaration is dated July 22, 2012.
27  Petitioner fails to show that the evidence was available in 2006 during Petitioner's trial, or why
28  defense counsel would have had any reason to interview Burciaga at that time.   Second,

1   Burciaga's statement is completely irrelevant insofar as it bears no relation to Petitioner's case.

2   It would surely have been excluded under California Evidence Code § 352.  Third, Burciaga

3   states he was shot *in the back* and there were several officers present.  Thus, his assertion that he

4   knows which officer shot him is not credible.  Fourth, "review under § 2254(d)(1) is limited to

5   the record that was before the state court that adjudicated the claim on the merits," and "evidence

6   introduced in federal court has no bearing on 2254(d)(1) review." Pinholster, 131 S.Ct. at 1398-

7   99.

8       In his traverse, Petitioner argues that Burciaga's testimony could have called into

9   question the identity of the actual officer who fired the bullet which struck and killed Campos.

10  This is irrelevant.  It does not matter which officer fired the fatal shot.  Overwhelming evidence

11  showed that Petitioner set into motion the chain of events that resulted in the fatality.  Therefore,

12  establishing that a different officer had fired the shot would not have altered the outcome of the

13  trial.

14      Accordingly, Petitioner fails to demonstrate that counsel was ineffective in failing to

15  interview this witness, or that counsel's failure to conduct an interview was prejudicial.

16          2.    Prosecutorial Misconduct

17      In his second ground for relief, Petitioner contends the prosecution failed to disclose

18  favorable evidence to the defense pursuant to Brady v. Maryland, 373 U.S. 83 (1963) in violation

19  of his due process rights.  He alleges the prosecution failed to disclose the follow-up reports of

20  "I.D. Technician" Matthew Pombo, and police officers Lisa Cross, Juan Gurrola, and Douglas

21  Wright.  Respondent alleges the claim is untimely, unexhausted, and meritless.

22      The claim was first raised in this Court in the First Amended Petition dated November

23  14, 2012.  Like his first claim for relief, this claim is untimely by over two years.  Therefore, it

24  must be dismissed.  In addition, the claim was never presented to the California Supreme Court

25  in the context of a prosecutorial failure to disclose under Brady.  It is thus unexhausted as well.

26      In any case, the claim is meritless.  Under Brady, "the State violates a defendant's right to

27  due process if it withholds evidence that is favorable to the defense and material to the

28  defendant's guilt or punishment." Smith v. Cain, 132 S. Ct. 627, 630 (2012) (citing Brady, 373

1  U.S. at 87).  "[E]vidence is 'material' within the meaning of <u>Brady</u> when there is a reasonable

2  probability that, had the evidence been disclosed, the result of the proceeding would have been

3  different." <u>Cone v. Bell</u>, 556 U.S. 449, 469–470 (2009).  A reasonable probability is such that the

4  likelihood of a different result is great enough to "undermine[ ] confidence in the outcome of the

5  trial." <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995).

6      Here, Petitioner alleges the prosecution failed to disclose follow-up reports of officers

7  Pombo, Cross, Gurrola, and Wright, but he fails to state what information these reports contained

8  that would have been favorable to the defense.  He fails to demonstrate that the evidence was at

9  all material.  The claim is therefore conclusory and without merit.

10      3.     <u>Trial Court Refusal to Order Competency Hearing</u>

11      Petitioner next contends he was denied his due process rights when the trial court failed

12  to order a competency hearing when substantial evidence existed of Petitioner's lack of mental

13  competence.  Respondent argues that the claim is untimely, procedurally defaulted and without

14  merit.

15      Petitioner did not present this claim in his original petition.  It was first raised here in his

16  First Amended Petition on November 14, 2012.  Therefore, as with the previous claims, this

17  claim is untimely by more than two years and must be dismissed.

18      The claim was also first raised in state court in Petitioner's second habeas petition to the

19  California Supreme Court.  That petition was dismissed as untimely.  As discussed in Ground

20  One, *supra*, the California Supreme Court's rejection of the claim on procedural grounds of

21  untimeliness bars this Court from considering the merits of the claim.

22      In addition, the claim is without merit.  A defendant may not be criminally prosecuted

23  while he is incompetent, and the state must give him access to procedures for determining his

24  competency. <u>See</u> <u>Medina v. California</u>, 505 U.S. 437, 449 (1992) (citing <u>Drope v. Missouri</u>, 420

25  U.S. 162, 172-73 (1975)); <u>Pate v. Robinson</u>, 383 U.S. 375, 386 (1966).  Where the evidence

26  before the trial court raises a "bona fide doubt" as to a defendant's competence to stand trial, the

27  judge on his own motion must conduct a competency hearing. <u>Pate</u>, 383 U.S. at 385.  The trial

28  judge must satisfy himself that the defendant is able to understand the proceedings against him

and assist counsel in preparing his defense. See Drope, 420 U.S. at 172 (citing Dusky v. United States, 362 U.S. 402, 402 (1960)).  Under Drope and Pate, the test for such a bona fide doubt is "whether a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial." de Kaplany v. Enomoto, 540 F.2d 975, 983 (9th Cir.1976) (en banc). "[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required," and "one of these factors standing alone may, in some circumstances, be sufficient." Drope, 420 U.S. at 180 (paraphrasing Pate, 383 U.S. at 385).  In reviewing whether a trial judge should have sua sponte conducted a competency hearing, the Court must consider only the evidence that was before the trial judge.  Williams v. Woodford, 384 F.3d 567, 604 (9th Cir. 2004).

In this case, Petitioner does not point to any evidence of irrational behavior, demeanor, or incompetence at trial.  He merely presents allegations that the physical trauma resulting from the gunshot wounds, the mental trauma caused by the death of his fiancée, his continued isolation, and his refusal to take pain medication caused "various psychological abnormalities that were not explored."  (See ECF No. 46 at 8.)  The claim is completely conclusory.  Moreover, the claim is refuted by the fact that Petitioner's testimony at trial was very coherent and articulate, indicating that he had a rational understanding of the proceedings against him. (RT 2541-81.) Indeed, Petitioner vacillates on this claim in his traverse, stating that "if [he] was competent to stand trial, it was only right before trial and partly due to the drugs he was given in order to cope with the pain." (Traverse at 40.)  The claim should be rejected.

4.    Trial Court Failure to Allow Substitution of Counsel

Petitioner contends the trial court denied him the fundamental right to counsel of choice when it failed to allow him to retain an attorney after an irreconcilable conflict of interest existed between them.  Respondent argues the claim is untimely, procedurally defaulted, and without merit.

///

1          a.      **Factual Background**

2          After several continuances, trial was set to commence on May 9, 2006. (CT 95, 146, 349-

3    51; RT 901, 918-919.)  At that time, Petitioner moved for substitution of counsel pursuant to

4    People v. Marsden, 2 Cal. 3d 118 (1970).  The Court then held a Marsden hearing.  (RT 907.)

5    Petitioner explained to the Court that he and his family had initially tried to find private counsel,

6    but had been unsuccessful. (RT 907.)  He stated he felt confident in his appointed counsel in the

7    beginning, but as time went on he became dissatisfied. (RT 907.)  Petitioner said he was

8    dissatisfied because: 1) he did not have his phone to call people for help; 2) he suffered from

9    hearing loss as a child, and he wanted his attorney to obtain records of a recent surgery

10   confirming his hearing impairment, but his attorney obtained records from Petitioner's former

11   pediatrician instead; 3) his attorney did not go over any questions that the prosecutor might ask

12   him on cross-examination until the Thursday before the hearing, and although they did go over

13   some questions at that time, Petitioner felt unprepared; and 4) he and his family had made a list

14   of pros and cons with respect to his appointed attorney, and the cons outnumbered the pros. (RT

15   907-910.)

16         The court then asked defense counsel to respond.  Defense counsel stated that the primary

17   focus of his preparation for trial was a review of the officer-involved shooting interviews and the

18   testimony at the preliminary hearing.   (RT 911.)   Counsel stated that there were many

19   contradictions between the interviews and the testimony that would be key to Petitioner's

20   defense. (RT 911.)  Responding to the complaints concerning Petitioner's readiness for cross-

21   examination, defense counsel stated he agreed with Petitioner when it was brought to his

22   attention, so he then spent some time with him going through rounds of questioning until he was

23   comfortable that Petitioner would be a good witness. (RT 911.)  As to the subject of Petitioner's

24   hearing loss, counsel stated it was a "double-edged sword" that "cuts both ways." (RT 911-12.)

25   Counsel stated that Petitioner spoke to police officers "all day long and heard very well."  (RT

26   912.)  He further noted that Petitioner heard very well when the undercover officer was in the

27   car. (RT 912.)  Therefore, he concluded that Petitioner's hearing loss was of limited value.  (RT

28   912.)  On the subject of Petitioner's cell phones, counsel stated that there were three cell phones

that Petitioner wanted returned.  (RT 912.)  Counsel stated he notified the prosecutor and they went to the Fresno Police Department twice.  (RT 912.)  They were able to retrieve names from one of the phones but they were unable to charge the other two.  (RT 912.)  Defense counsel hoped he could charge the phones and retrieve names in the near future.  (RT 912.)

Defense counsel also consulted an accident reconstruction expert but decided not to call the expert when it became known the prosecution would not be calling their own expert. (RT 913.)  He also contacted the physician regarding Petitioner's childhood hearing loss, but his investigator "was told that she was a dog and to get away. . . ." (RT 913.)  Nevertheless, counsel had subpoenaed the records.  (RT 913.)  Counsel also noted that he sought discovery of personnel records of the police officers involved in the shooting.  (RT 913.)  In addition, defense counsel contacted and interviewed a number of people identified in the police reports as potential witnesses, but none of them had observed the incident.  (RT 915.)  Defense counsel stated he felt ready for trial.  (RT 916.)

The trial court denied the <u>Marsden</u> motion after determining that counsel had not been deficient and there had not been a breakdown in communication.  (RT 916.)  As to Petitioner's request for a continuance, the court informed Petitioner that he would have to bring the motion in the presence of the prosecutor.  (RT 918.)  The court advised Petitioner and defense counsel that they would be given a few minutes to discuss the issue, and then once the prosecutor returned, they could request a continuance if they desired.  (RT 920.)

After the recess, defense counsel moved for a continuance in order to obtain and activate Petitioner's phones, because Petitioner had just informed him that the phones might contain information relating to potential witnesses.  (RT 923-24.)  The court found the request for continuance to be untimely and without a factual basis.  (RT 925.)  Therefore, the formal request for continuance was denied.  (RT 925.)  However, the court advised the parties that they could inspect the phones that afternoon, and if defense counsel discovered specific relevant information, the court would revisit the motion.  (RT 925.)  The defense did not request another continuance.  (CT 359-62, 380.)

///

b.      **Untimeliness and Procedural Default**

Respondent contends that the claim is untimely.  Petitioner raised this claim in his initial federal habeas petition on September 26, 2010, which was before the limitations period had expired.  However, Petitioner chose to delete the claim pursuant to <u>Kelly v. Small</u>, 315 F.3d 1063 (9th Cir. 2003), in order to exhaust it in state court.  He raised the claim again in his first amended petition on November 14, 2012, but this was over two years after the limitations period had expired.  Because Petitioner deleted the claim using the <u>Kelly</u> procedure, it is not considered filed as of the date of the initial petition.  <u>King v. Ryan</u>, 564 F.3d 1133, 1140-41 (9th Cir. 2009). Therefore, Respondent is correct that the claim is untimely and must be dismissed.

Respondent further argues that the claim is procedurally defaulted.  The claim was denied in the original state habeas petition to the California Supreme Court with a citation to <u>In re Swain</u>, 34 Cal.2d 300, 304 (1949), which indicates that the claim was denied for failure to state claims with sufficient specificity.  Thus, the claim was unexhausted.  Petitioner presented the claim again in his second state habeas petition to the California Supreme Court where it was dismissed as untimely.  For the reasons stated above in Discussion Section C, Part 1(b), the claim is procedurally defaulted.

c.      **Merits**

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right "guarantees a defendant the right to be represented by an otherwise qualified attorney whom that defendant can afford to hire, or who is willing to represent the defendant even though he is without funds." <u>Caplin & Drysdale, Chartered v. United States</u>, 491 U.S. 617, 624-25 (1989); <u>see also</u> <u>Powell v. Alabama</u>, 287 U.S. 45, 53 (1932) ("It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice.").  Nevertheless, the Supreme Court has held that the right to counsel of choice is "circumscribed in several important respects." <u>Wheat v. United States</u>, 486 U.S. 153, 159 (1988).  The Supreme Court has established that a trial court requires "wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of

its calendar." <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140, 152 (2006) (citation omitted). As such, trial courts retain the discretion to "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel." <u>Id</u>.

In this case, it is clear that Petitioner's right to counsel of his choosing was not violated. Petitioner never asked the trial court to replace his appointed counsel with private counsel, and the trial court never entertained such a motion. Petitioner made a <u>Marsden</u> motion, which was denied, but said motion was to replace counsel with another court-appointed attorney. As to Petitioner's request for a continuance to obtain private counsel, the trial court advised Petitioner that he needed to make such a request in the prosecutor's presence. Defense counsel later made a request for continuance, but it was not for the purpose of seeking private counsel; it was for the purpose of inspecting Petitioner's cell phones to determine whether additional evidence existed with respect to witnesses. Petitioner never moved for a continuance to seek private counsel. Therefore, the trial court did not violate his right to counsel of his choosing. <u>See Miller v. Blacketter</u>, 525 F.3d 890, 896 (9th Cir. 2008) (trial court did not violate defendant's right to counsel of choosing when at the time request for continuance was made, private counsel had not yet been identified or retained).

Viewing these facts under the deferential standard of § 2254(d)(1), it cannot be concluded that Petitioner's right to counsel of choice was violated. The claim is without merit.

5.   <u>Insufficient Evidence of Provocative Act</u>

Next, Petitioner claims there was insufficient evidence to support his conviction for second degree murder under the provocative act doctrine, which the appellate court explained as follows:

> "[D]erivative liability for homicides attaches . . . when the defendant's intentional provocative act proximately causes the death of a victim through the action of a third party." Liability results because the nature of a provocative act – an act "that is deliberately performed by the defendant or his accomplice with conscious disregard for human life and that has natural consequences dangerous to human life" - is such that malice is implied from the intentional doing thereof. The killing is attributable not merely to the commission of a felony, "but to the intentional act of the perpetrator committed with conscious disregard for life." Because the killing is a response to the situation created by the perpetrator's intentional act, it is not deemed to be an independent intervening cause that relieves the perpetrator of liability.

1   (LD 4 at 10, internal citations omitted.)

2   Respondent contends that the claim is untimely, procedurally defaulted, and without

3   merit.

### a.   Untimeliness and Procedural Default

5   As previously discussed, this claim was first raised in Petitioner's initial federal habeas

6   petition on September 26, 2010, prior to the expiration of the limitations period.  Petitioner chose

7   to delete the claim pursuant to the <u>Kelly</u> procedure.  He raised it again in his first amended

8   petition on November 14, 2012, after the limitations period had expired.  Because Petitioner

9   deleted the claim using the <u>Kelly</u> procedure, it is not considered filed as of the date of the initial

10   petition.  <u>King</u>, 564 F.3d at 1140-41.  Therefore, Respondent is correct that the claim is untimely

11   and must be dismissed.

12   In addition, the claim was denied in the original state habeas petition to the California

13   Supreme Court with a citation to <u>In re Swain</u>, 34 Cal.2d 300, 304 (1949), which indicates that the

14   claim was denied for failure to state claims with sufficient specificity.  Thus, the claim was

15   unexhausted.  Petitioner presented the claim again in his second state habeas petition to the

16   California Supreme Court where it was dismissed as untimely.  For the reasons stated above in

17   Discussion Section C, Part 1(b), the claim is also procedurally defaulted.

### b.   Merits

19   The United States Supreme Court has held that when reviewing an insufficiency of the

20   evidence claim, a court must determine whether, viewing the evidence and the inferences to be

21   drawn from it in the light most favorable to the prosecution, any rational trier of fact could find

22   the essential elements of the crime beyond a reasonable doubt.  <u>Jackson v. Virginia</u>, 443 U.S.

23   307, 319 (1979).  Sufficiency claims are judged by the elements defined by state law.  <u>Id.</u> at 324

24   n.16.  On federal habeas review, AEDPA requires an additional layer of deference to the state

25   decision.  <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  This Court must determine

26   whether the state decision was an unreasonable application of the <u>Jackson</u> standard.

27   In this case, in order to find Petitioner guilty of murder under the provocative act

28   doctrine, the prosecution was required to prove that: 1) The crime of possession for sale of

methamphetamine was committed; 2) During the commission of that crime, the defendant also committed an intentional provocative act; 3) A peace officer killed another person in response to the provocative act; 4) The defendant's commission of the intentional provocative act was a cause of death of the victim, Katrina Campos. (CT 474-475.)  An "intentional provocative act" was defined as follows:

> 1) The act was intentionally committed;
> 2) The natural consequences of the act were dangerous to human life because there is a high probability that the act will provoke a deadly response; and
> 3) The act was deliberately performed with knowledge of the danger to, and with conscious disregard for human life.

(CT 474.)

Substantial evidence supported each element in this case.  The first element, that Petitioner possessed methamphetamine for sale, is undisputed.  With respect to the second element, there was ample evidence in the record from which to find Petitioner committed an intentional provocative act.  When Detective Cervantes gave the signal, arresting officers converged on the location with their vehicles, exited their vehicles, approached Petitioner and shouted that they were the police, and ordered Petitioner to show his hands.  The officers were wearing tactical vests which had a four- to five-inch white or yellow Fresno Police Department star, with a patch bearing the word "Police" on the front, and the word "Police" in large letters on the back.  Petitioner made eye contact with one officer and yelled, "Fuck, it's the cops."  Almost immediately, Petitioner put the vehicle into reverse and accelerated his vehicle.  It side-swiped one vehicle and then immediately moved directly at two officers.  Judging by the vehicle's rate of speed, both officers did not think they could get out of the way in time and were forced to leap out of the way.  Two other officers testified that they had to jump out of the way.  One stated that Petitioner's car was so close as to be right on top of him.  Clearly, there was sufficient evidence from which the jury could have found that Petitioner committed an intentional provocative act by driving his vehicle at police officers.

With regard to the third and fourth elements, the record shows that several officers fired their weapons at Petitioner's vehicle in response to Petitioner's provocative act.  Officer Garza fired two rounds at the vehicle because the vehicle was coming directly at him at a high rate of

speed, and he believed he would be run down.  He in fact jumped onto the bumper in his attempt to avoid being run over, and sustained multiple bodily injuries when Petitioner then drove the vehicle into another vehicle.  Officer Cardinale testified he opened fire in an attempt to save Officer Garza from being run over or crushed between two vehicles.  Officer Jauregui stated he fired his weapon when the vehicle accelerated toward him.  As a result, Katrina Campos was shot in the head and died.  Again, there was more than enough evidence for the jury to conclude the officers killed Katrina Campos in response to Petitioner's provocative act.

Petitioner argues that Manuel Burciaga's post-trial declaration demonstrates that the evidence was insufficient.  However, as previously stated, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits," and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Pinholster, 131 S.Ct. at 1398-99.

For these reasons, the state court decision to uphold Petitioner's conviction was not contrary to or an unreasonable application of clearly established Supreme Court precedent.  See Carey, 549 U.S. 70.  The claim should be rejected.

### 6.   Ineffective Assistance of Appellate Counsel

In his sixth and final claim for relief, Petitioner argues that appellate counsel rendered ineffective assistance by failing to raise the above grounds on direct appeal.  In his traverse, he concedes that the claims fails.

Respondent correctly argues that the claim is untimely and procedurally defaulted.  As with his previous claims for relief, Petitioner did not present this claim to this Court until he filed his first amended petition on November 14, 2012.  It is therefore untimely.  In addition, Petitioner did not raise it to the California Supreme Court until he filed his second state habeas petition.  That petition was rejected as untimely; therefore, it is procedurally defaulted.  It is also plainly without merit.

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment.  Evitts v. Lucey, 469 U.S. 387, 391-405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to Strickland's two-pronged test.  Miller

1  v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th

2  Cir. 1986).  The presumption that counsel acted reasonably is even stronger for appellate counsel

3  because he has wider discretion than trial counsel in weeding out weaker issues; doing so is

4  widely recognized as one of the hallmarks of effective appellate assistance.  Miller, 882 F.2d at

5  1434.

6          In this case, all of Petitioner's claims are without merit.  Appellate counsel did not render

7  ineffective assistance since failure to raise a meritless legal argument does not constitute

8  ineffective assistance of counsel.  Shah v. United States, 878 F.2d 1156, 1162 (9th Cir. 1989);

9  Jones v. Barnes, 463 U.S. 745, 754 (1983) (appellate counsel must exercise professional

10 judgment in selecting issues to be raised on appeal and does not have the duty to raise every

11 claim suggested by a client).

12         Petitioner fails to show that the state court denial of this claim was contrary to, or an

13 unreasonable application of, Supreme Court law.  The claim should be rejected.

14         7.    Other Claims

15         Petitioner raises a number of other claims in his traverse which were not presented in the

16 amended petition.  The Court notes that "[a] Traverse is not the proper pleading to raise

17 additional grounds for relief." Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994).

18 Moreover, Petitioner's attempts to amend the petition to include additional claims have been

19 rejected.  Therefore, the claims should not be entertained.

20                                          **IV.**

21                              **RECOMMENDATION**

22         Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH

23 PREJUDICE.

24         This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill,

25 United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and

26 Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of

27 California.  Within thirty (30) days after service of the Findings and Recommendation, any party

28 may file written objections with the court and serve a copy on all parties.  Such a document

1   should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies

2   to the objections shall be served and filed within fourteen (14) days after service of the

3   objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. §

4   636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may

5   waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir.

6   1991).

7

    IT IS SO ORDERED.

8

9   Dated:   **July 10, 2014**

    _____
    UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28